

FILED
8-14-13
AUG 1 4 2013

THOMAS G BRUTON
CLERK, U S DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA, *ex rel.*

CAROLINE TYERS, LISA HIGGINS,
SHAPRAY HENDRICKS, LISA VERONA,

    Plaintiffs-Relators,

        v.

MOBILE DOCTORS USA, LLC, IN HOME
DIAGNOSTICS, LLC, DIKE AJIRI,
DAVE EVANS, and TYSYN CONTRERAS,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Filed Under Seal and In Camera

1:13-cv-05784
Judge Ruben Castillo
Magistrate Judge Michael T. Mason

Jury Trial Demanded

### COMPLAINT

Now comes the United States of America, on the relation of Caroline Tyers, Lisa

Higgins, Shapray Hendricks, and Lisa Verona, directly as plaintiffs, and complains of

Defendants Mobile Doctors USA, LLC ("Mobile Doctors"), In Home Diagnostics, LLC

("IHD"), Dike Ajiri, and Dave Evans, as follows:

#### Introduction

1.    This action seeks damages and civil penalties arising from violations of the

federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

2.    Relators Caroline Tyers, Shapray Hendricks, and Lisa Verona are current

employees of Mobile Doctors's Chicago office. Relator Lisa Higgins was employed by Mobile

Doctors's Chicago office until July 19, 2013. Each has substantial knowledge of the various

frauds committed by the Defendants.

3.    As described in more detail below, Defendants have engaged in a systematic

pattern of Medicare fraud, and over the years, they have cheated Medicare out of millions of

dollars. Defendants profited greatly from their fraud by, among other acts, requiring non-medical staff to add unnecessary diagnostic tests to physician orders; upcoding to receive higher Medicare reimbursements; falsifying bills to misrepresent that physicians performed ultrasounds when unsupervised techs performed them; creating financial incentives for physicians to order needless diagnostic tests and blood labs; ordering unnecessary mental status exams; and submitting false bills for reimbursement of care plan oversight when in fact no physician time was expended.

4.     Moreover, the Defendants have conspired to cover up their fraud by falsifying records produced during a government audit and by ordering their employees to lie to the Medicare auditors.

5.     Since discovering the various frauds that Mobile Doctors has been committing, each of the relators has tried to put a stop to Defendant's misconduct. As a result of their efforts to interrupt the company's fraudulent activities, Dike and other management-level employees have threatened the relators, increasingly scrutinized their behavior, and subjected them to constructive demotions. On July 19, 2013, Defendants terminated relator Lisa Higgins.

Parties

6.     Relator Shapray Hendricks is the manager of the centralized billing department in Mobile Doctors' corporate office, in Chicago, IL. Ms. Hendricks has been working for Mobile Doctors in this position since March 2010. She has worked in healthcare since 1998. Her department performs all of the billing for Mobile Doctors medical and podiatry services, Mobile Ultrasound, In Home Diagnostics, and the Clinical Laboratory of MD, for locations in six states.

7.     Lisa Higgins was hired by Mobile Doctors as a Chicago clinical coordinator in April 2011. She was promoted to Director of Clinical Coordinators in October 2011 and held

2

this position until she was terminated in July 2013. Ms. Higgins is a former paramedic and has worked in various healthcare settings since 2002. She managed the clinical coordinators and worked closely with the medical providers at the Chicago branch.

8.     Lisa Verona, who supervised Lisa Higgins, serves as the Chicago office Branch Manager and has been in this position since November 2011. Ms. Verona holds a BS in Psychology/Sociology and an MBA with certification in Organizational Development. She has worked in healthcare since 2000 in various roles including Director of Purchasing for a hospital, Director of National Accounts for a managed care company, and an Assistant Program Director, consulting process improvement services for academic medical centers. As branch manager Ms. Verona exchanges daily communication with Dike Ajiri and is held responsible by him for oversight of all medical and podiatry providers and daily branch operations.

9.     Caroline Tyers is the corporate Operations Manager. Dr. Tyers (holding a PhD in Biological Anthropology) was hired in September 2012 as a Branch Manager in Training at the Chicago office. This position provided her training on almost every branch operation and corporate role in Mobile Doctors, and allowed her to travel with Dike Ajiri to all nine Mobile Doctors branches to learn about his management of Mobile Doctors and Mobile Ultrasound. In December 2012, Dr. Tyers assumed her current role with the primary task of managing Mobile Doctors' project to implement new practice management software and transition from paper charts to electronic health records.

10.     Defendant Mobile Doctors USA, LLC is a management group that manages several entities performing medical, podiatry, and ultrasound services in patients' homes. The vast majority of Mobile Doctors' patients are Medicare Part B enrollees. Dike Ajiri owns 98% of Mobile Doctors and is its CEO. The remaining 2% is owned by Eileen Ajiri, Dike's mother.

11.     Practicing under the management of Mobile Doctors are more than 70 medical and podiatric doctors and a few nurse practitioners. They are contracted by a physician group called Lake MI Mobile Doctors. These providers work out of nine branches that are managed and staffed by Mobile Doctors employees, located across six states.

12.     Defendant In Home Diagnostics ("IHD"), d/b/a/ Ultrasound 2 You, is affiliated with Mobile Doctors. IHD is certified as an independent diagnostic testing facility and performs ultrasounds for both Mobile Doctors patients and outside patients. IHD is 97% owned by Evans and 3% by Ajiri. Its two locations are housed within Mobile Doctors facilities.

## Jurisdiction and Venue

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under a federal statute, 31 U.S.C. § 3729, *et seq*. There has been no public disclosure of the fraud alleged herein. Moreover, relators are original sources because 1) prior to any public disclosure they voluntarily disclosed to the government the information on which the allegations in this suit are based; and 2) they have knowledge that is independent of, and materially adds to, any publicly disclosed information, and voluntarily provided the information to the government before filing this suit.

14.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 31 U.S.C § 3732(a) because at least one of the Defendants conducts business in this judicial district and at least one of the claims giving rise to this Complaint occurred in this judicial district.

## Facts

### I.     Ordering Tests Without a Physician's Order

15.     Mobile Doctors instructs its clinical coordinators – who are not certified or licensed medical professionals and did not receive significant on-the-job medical training – to

4

order diagnostic tests for patients without *any* consultations with the doctor. In fact, the company requires its physicians to sign away their control over their patients' medical care by pressuring them to sign "standing orders," which despite the deceptively benign name are actually authorizations signed by doctors allowing clinical coordinators to order tests under a doctor's name without the doctor's prior express approval. Thus, no medical judgment is exercised with regard to these tests.

16.     If a physician makes any diagnosis that is listed as a billable diagnosis for a certain ultrasound, and if that physician had signed a Mobile Doctors "standing order," then a clinical coordinator would automatically order one or more diagnostic tests associated with that billing diagnosis, without regard to whether the test was medically necessary and would result in a review of and/or change to the patient's plan of care.

17.     Clinical coordinators are supposed to order that diagnostic test whenever they see the associated diagnosis. For instance, a diagnosis of "long term use of meds" automatically triggers the ordering of an echocardiogram, by a clinical coordinator, for all patients whose physicians signed "standing orders." Medicare does not receive the routing slip; instead, it receives only the CMS 1500 claim form, which identifies the treating physician as the person who ordered and performed the ultrasound.

18.     In some instances, of course, doctors did order the ultrasound themselves. In those instances, the doctor's "Subjective Objective Assessment and Plan" ("SOAP") notes documented in the patient's chart reflect the decision to order the ultrasound. Comparing the routing slip against the patient's charts will thus reveal those instances in which the clinical coordinator ordered a non-medically necessary ultrasound.

19.     The relators have first-hand knowledge of hundreds of ultrasounds that were ordered in the Chicago branch by clinical coordinators, not the medical provider, and the relators themselves were trained to order ultrasounds without regard to medical necessity. Relator Higgins directly supervised the clinical coordinators, who ordered the ultrasounds based solely on billable diagnoses.

20.     In addition, Mobile Doctors compounds the fraud by referring the scan to Mobile Ultrasound or In Home Diagnostics, both of which are entities owned by Dike Ajiri and Dave Evans. In violation of the Stark Act, Ajiri and Evans force their employees to order tests that are performed by a third-party in which they have a financial stake, thus causing Medicare to reimburse for countless unnecessary tests simply so that Defendants can profit.

21.     Mobile Doctors engages in an additional type of fraud in this arena. Mobile Doctors bills Medicare for ultrasounds as if its own doctors are performing the ultrasounds (both the technical and professional components), when in fact those ultrasounds were done by either a Mobile Ultrasound or IHD technician. For instance, the routing slip for Patient Q shows that Dr. Borden ordered an echocardiogram (CPT code 93306) on April 17, 2012. A hand-written note next to that CPT code reflects that the clinical coordinator ordered the ultrasound on April 18, per the doctor's order. The echocardiogram report reflects that Ultrasound 2 You (a/k/a/ IHD) performed the ultrasound. Yet the Medicare CMS 1500 claim form submitted to Medicare to bill for Patient Q's ultrasound misrepresents that Dr. Borden of Mobile Doctors performed the ultrasound. Likewise, Mobile Doctors submitted false bills for Patients X, Y, and Z. These instances of fraud are not isolated, but rather, are standard billing practice at Mobile Doctors and In Home Diagnostics.

6

22.     Finally, Mobile Doctors falsifies the identity of the physician who ordered the ultrasound in order to get reimbursed by Medicare. Mobile Doctors podiatrists order ultrasounds of a patient's leg or foot for various medical reasons. In keeping with its fraudulent practice described above, Mobile Doctors would hire IDH to perform the ultrasound, but would bill Medicare as if the doctor – here, the podiatrist – performed it. However, Medicare recently began denying these claims, citing "PR 172," which means, "Payment is adjusted when performed/billed by a provider of this specialty." Podiatrists are not authorized under Medicare to receive reimbursement for performing ultrasounds. Once Medicare denied the claims for payment, Mobile Doctors began the fraudulent practice of resubmitting the bills, but under an MD's name. The MD never ordered the test and never even reviewed the order. The bill represents that a medical physician, instead of a podiatrist, performed the ultrasound, when in fact Mobile Doctors had randomly selected that doctor's name. To be clear, the relators believe the doctors whose names are used are unaware of this fraudulent practice. The newly selected doctor had not performed the work, nor did that doctor know or consent to being used as the billing physician. Mobile Doctors simply added a "Q6 modifier" and improperly recovered Medicare funds.

23.     For instance, Dr. Hayes, a podiatrist, ordered an ultrasound for Patient A on 2/11/13. The ultrasound was performed by Ultrasound 2 You on 2/21/13, and the results were provided to Mobile Doctors on 2/22/2013. Medicare denied the claim when it was billed as being performed by Dr. Hayes, DPM. So, Mobile Doctors resubmitted a new bill for the same ultrasound, this time claiming it was performed by Dr. Koroma, MD. Likewise, the initial and subsequent claims for Patients B and C show the same re-submission under a different doctor's name.

7

24.     Meeting minutes from an internal company meeting on billing matters, run by Dave Evans on July 16, 2013, reflect that employees were instructed to "give all POD only (ultrasounds ordered by a podiatrist for podiatry only patients) to Dave E[vans] to bill so he can send them out under a specific doctor and track them as they are not paying when billed under a podiatrist. Any ultrasounds ordered by a podiatrist for patients who also receive medical home visits should be billed under the regular doctor who usually sees them."

25.     Mobile Ultrasound has also been submitting fraudulent bills indicating that it had a supervising physician when it did not, in violation of the IDTF regulations. Internal company documents show that Dr. Dipti Gupta, the supervising cardiologist for Mobile Ultrasound, left the company effective April 14, 2013. On July 12, 2013, Mobile Ultrasound submitted a request for change of information to the WPS Medicare Part B office seeking to remove Dr. Gupta as supervising/interpreting physician. Yet, Mobile Ultrasound submitted bills for ultrasound services on several occasions *after* April 14 that listed Dr. Gupta as the supervising physician, though she no longer worked there. For instance, bills for Patients E, F, G, and H falsely state that Dr. Gupta supervised ultrasounds that were performed after she had left the company. The company did so because it had not yet replaced Dr. Gupta with another Medicare-approved supervising/interpreting physician.

## II.     Upcoding

26.     For years, Mobile Doctors has repeatedly upcoded patient visits, so that Mobile Doctors can receive a higher Medicare reimbursement than it is entitled to receive given the actual medical services provided to the client.

27.     Mobile Doctors does this in two primary ways. First, Mobile Doctors has a company-wide policy of billing every routine home visit at a medium- to high-complexity CPT code, no matter which medical services were provided.

28.     Clinical coordinators are instructed that *all* routine home visits for established patients should be marked as CPT code 99349, which is also referred to internally as a Level 3 visit. The clinical coordinators are instructed to mark CPT code 99344 for all new patients, which is referred to as a Level 4 visit. The relators reviewed a sampling of routing slips, which confirmed that clinical coordinators gave all established patients an initial CPT code of 99349, regardless of whether that code was medically appropriate. In addition, relator Lisa Higgins was the Director of Clinical Coordinators in the Chicago office and has personal knowledge that the foregoing instructions are given to all clinical coordinators within the Chicago office.

29.     These blanket instructions are given regardless of whether the physician's level of care actually corresponded to the criteria for those CPT codes. This results in routine upcodes of visits. For instance, the AMA requires at least two of the following criteria to be met for CPT code 99349: "A detailed interval history; a detailed examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are moderate to high severity. Typically, 40 minutes are spent face-to-face with the patient and/or family."

30.     Mobile Doctors' blanket instruction to use the CPT code 99349 for all established patient visits does not take into account the foregoing criteria. Tysyn Contreras, under the direct supervision of Ajiri, has justified this method of coding by stating that the doctors are required to

9

complete the SOAP forms, designed by Mobile Doctors, and doing so in itself forces the visit to be of at least moderate complexity. This is, of course, not accurate, given that even a short, perfunctory visit with a patient can generate completed SOAP forms.

31. In order to ensure that sufficient documentation exists to support this fraudulent billing practice, moreover, doctors and clinical coordinators are instructed to create false documentation for patients' charts. Specifically, in order to support the Level 3 coding (i.e., CPT code 99349), doctors are repeatedly told that they are required to document at least three problems on the SOAP forms for every visit and record at least three diagnoses, preferably four, for each patient for every visit on the routing slip – this is regardless of the number of actual diagnoses addressed at the medical visit. Doctors who do not follow this rule for routing slips are side-stepped by the clinical coordinators, who add diagnoses to the patient's routing slip based on their interpretations of, and extrapolations from, the doctors' notes. In some cases, clinical coordinators simply pull another diagnosis from an earlier routing slip. This is done so that the automatic Level 3 CPT code 99349 could be supported by the underlying documentation, in case of a Medicare audit.

32. Another way in which the standard in-home visit for established patients rarely meets the AMA criteria for a Level 3 CPT code of 99349 is the abbreviated length of the visits. Mobile Doctors' physicians seldom spend 40 minutes performing an established patient's in-home visit.

33. Second, among these batches of already upcoded bills, further upcoding is done by Mobile Doctors Director of Quality Assurance Tysyn Contreras (who is married to Ajiri's cousin-in-law, also Evans' cousin-in-law). Contreras randomly selects bills and bills at the highest level of complexity, so that they receive the highest possible Medicare reimbursement

10

amount. In other words, CPT codes have no bearing to the medical service that was actually provided.

34.     After the clinical coordinator completes the routing slip, the original is placed in the patient's chart, and the yellow carbon copy is sent to Tysyn Contreras. On the carbon copy of the routing slip, Contreras crosses out the clinical coordinator's selection of the Level 3 visit CPT code and selects a higher CPT code. No explanation is provided anywhere for the higher level CPT code. In addition, Contreras never gathers or requests copies of the patients' charts in conjunction with the routing slips, so it is clear that he has upcoded these bills without ever reviewing the medical documentation to see if the higher code is medically appropriate.

35.     For example, the original routing slips for Patients I-N, T, and U show a Level 3 code by the clinical coordinator; the yellow carbon copies show a Level 4 upcode by Contreras; and there is nothing in these patients' charts to justify a Level 4 (or Level 3) CPT code.

36.     CPT codes for Level 1 and Level 2 care are rarely used, pursuant to company policy. That is, clinical coordinators are trained to code visits at the CPT code 99349 or 99344 or higher, for established and new patients, respectively, even if the lower level codes are the more medically appropriate ones for the level of service provided. The lower level codes are worth a lower reimbursement rate than the Level 3 and Level 4 codes that Mobile Doctors uses instead.

III.    **Routine Follow-Up Exams**

37.     Mobile Doctors' standard practice is to schedule follow-up exams with patients every four weeks, even when not medically necessary. Every morning, Mobile Doctors employees generate lists of patients from the patient account software who have not been visited in the last 28 days. Using that list, they call patients to tell them their doctor is going to be in the area tomorrow and would like to visit them. The patient's actual need for the visit is not

11

considered. If the scheduler is unable to make a full schedule of visits using the 28 day list,, then schedulers call patients that have not been seen in 27, then 26, then 25 days, until a full day's schedule is made.

38. Medicare is billed for these routine exams, regardless of the fact that the exams themselves may not be necessary. One physician who tried to stop this practice and schedule follow-up visits only when medically necessary was unsuccessful and ultimately resigned.

**IV. RVUs**

39. Mobile Doctors improperly incentivizes physicians to order medically unnecessary laboratory and diagnostic tests that are performed by Ajiri and Evans owned companies. Each month, a fiscal department employee in the corporate office calculates each physician's relative value units ("RVUs"), a Medicare term that is given a unique meaning at Mobile Doctors. At Mobile Doctors, a doctor's RVUs are calculated based on the number of patients she sees, the complexity of the visit, and the number of lab and diagnostic tests ordered. Notably, doctors receive more "points" and thus more money if they order lab tests that are fulfilled by entities owned by and/or affiliated with Mobile Doctors, Dike Ajiri, and Dave Evans.

40. No "points" are given for ordering any diagnostic testing or lab work that is performed by non-Ajiri/Evans owned companies, such as x-rays or blood tests that have to be sent to a different laboratory than Clinical Laboratory of MD for results. Put differently, Mobile Doctors gives remuneration to physicians in order to reward them for past referrals and incentivize future referrals of patients to Mobile Ultrasound and In Home Diagnostics, and for sending blood work to Clinical Laboratory of MD.

41. Ajiri would regularly demand that relators Lisa Verona and Lisa Higgins pressure the physicians to order more tests and conduct more blood draws. When Ms. Verona pushed

12

back and expressed reservations about pressuring the doctors, Ajiri threatened her with adverse employment consequences.

## V. Q6

42.     A portion of Mobile Doctors' patients receive their Medicare benefits through Medicare advantage plans.   That is, a private insurance company contracts with Medicare to provide the patient's Part B benefits, for in-home physician services.  Mobile Doctors has been submitting false bills to those advantage care plans in order to obtain Medicare reimbursement improperly.

43.     To effect this fraud, Mobile Doctors improperly uses the Medicare Q6 modifier, intended for substitute physicians who provide services in place of the regular, billing physician on a temporary basis.  Under Medicare regulations, if the doctor who performed the service is not the billing physician, the invoice must disclose that by citing the "Q6" modifier.

44.     Mobile Doctors has been contracting with physicians who have not been accepted as approved Advantage Plan providers to submit claims.  In other words, they have been blacklisted from certain insurance companies.  Mobile Doctors allows the blacklisted physicians to see patients who receive their Medicare insurance benefits through those private insurance companies, even though Mobile Doctors knows the physicians have been blacklisted.  The blacklisted physicians perform the examination, complete their SOAP forms, and send the chart through the internal system of Mobile Doctors, described above.  When it comes time to bill for the service, Mobile Doctors will note the Q6 modifier on the claim and will prepare a bill under a different, *approved* billing physician's name.  While the bill sometimes does state that the blacklisted physician performed the examination, it does so in an extremely cursory and abbreviated way, such as by simply noting the first three letters of that physician's last name,

without an NPI number or any other identifier, and thus makes it highly unlikely that the insurance company will detect the violation without an audit-type review.

45.     For instance, Dr. Britt Borden is not approved by Aetna. He conducted an in-home visit (CPT Code 99350) for an Aetna patient on April 2, 2013. The Q6 modifier was used, and the visit was billed using Dr. Nandana Jasti's name and provider NPI. Likewise, Dr. Jasti was not approved under BCBS IL, and so a visit performed by her on April 9, 2013 was billed under approved Dr. Banio Koroma's name using the Q6 modifier.

46.     Mobile Doctors has committed another serious sleight of hand involving its various branches. Namely, when it opens up a practice in a particular location but does not yet have any Medicare-approved physicians at that location, it will allow its non-approved physicians to see patients. Then it will bill those visits as if they occurred at a different Mobile Doctors branch with a different, Medicare-approved physician. For example, Mobile Doctors' San Antonio, TX facility opened in November 2012 without any approved doctors but began seeing patients and billing Medicare for those visits. The patients were billed as if they had been patients of the Austin, TX, branch, using the Q6 modifier to bill under an Austin physician. Likewise, St. Louis, MO's Mobile Doctors branch had no Medicare-approved physician. Ajiri wanted to see patients at that location and receive Medicare payments for it. Accordingly, Mobile Doctors allowed Dr. Sugarbaker to see patients at the St. Louis location, even though Dr. Sugarbaker was not approved by Medicare to practice there.

**VI.    Care Plan Oversight**

47.     Another service for which Mobile Doctors bills Medicare is care plan oversight ("CPO") for patients of third-party home health agencies. Mobile Doctors receives Medicare reimbursement for this service by billing the CPT code G0181.

14

48.     The Medicare rules governing care plan oversight are extremely stringent and specific. CPT code G0181 requires "physician supervision of a patient receiving Medicare-covered services provided by a participating home health agency (patient not present) requiring complex and multidisciplinary care modalities involving regular physician development and/or revision of care plans, review of subsequent reports of patient status, review of laboratory and other studies, communication (including telephone calls) with other health care professionals involved in the patient's care, integration of new information into the medical treatment plan and/or adjustment of medical therapy, within a calendar month, 30 minutes or more."

49.     In order to bill for CPO, the physician must perform one or more of the qualifying CPO services; the physician must perform these services for at least 30 minutes in the month the CPO is billed; and the physician must document the type of service performed, the date performed, and length of time the service was performed.

50.     In addition, Medicare requires that the physician who bills CPO must be the same physician who signed the home health plan of care. Also, the physician who bills CPO must be the one who performed the face-to-face encounter, no more than six months prior to the first care plan.

51.     Running afoul of these central requirements, Ajiri randomly selects patients and bills Medicare for the G0181 procedure as if those patients received CPO from a Mobile Doctors physician, when they did not. The billing department bills Medicare for care plan oversights as instructed by Ajiri, using the CPT code G0181. The CPOs that are billed to Medicare from these reports were not actually performed.

52.     For instance, a review of the patients charts corresponding to the CPOs that were billed as having been performed by Drs. Ramos and Zhang from April to December 2011

revealed that not a single one of those CPOs had actually been performed. Relators expect that a full review of the Mobile Doctors patient charts will confirm what they have learned through their years of experience with the company—Mobile Doctors is submitting patently false claims for Medicare funds by exploiting the care plan oversight reimbursement scheme.

53.     Another Medicare requirement for CPO, as noted above, is that the physician who performs the CPO, i.e., CPT code G0181, must be the same physician who signed the care plan. In order to sign the care plan, moreover, the physician must have conducted a face-to-face encounter with the patient. At times, the physician who signs the care plan is not the physician who performed the actual face-to-face encounter. In those instances, Mobile Doctors' billing handbook instructs billers to change the physician's name to match the name of the person who actually did the earlier in-person visit. The claim for the fraudulently billed CPO is made similarly. No doctor's names are listed on the CPO report prepared by Ajiri; the billers are instructed to bill the patient's CPO by matching the name of whichever doctor performed the earlier in-person visit. This is done to ensure that the Medicare reimbursement claim is not denied.

54.     In terms of volume, Mobile Doctors bills thousands of CPOs to Medicare every year. In the Chicago office, it billed 1,713 CPOs in 2010, 2,279 CPOs in 2011, and 2,632 CPOs in 2012. In the Detroit office, it billed 441 CPOs in 2010, 742 CPOs in 2011, and 1,582 in 2012 (from Jan. to Nov.). The vast majority of the CPOs were fraudulently billed as no CPO work was actually performed. Medicare reimbursement for these CPOs ranged from $83 to $140 per CPO, resulting in hundreds of thousands of dollars fraudulently obtained.

## VII.    Mental Status Exams

55.     Mobile Doctors engages in a routine practice of scheduling mental status exams

16

("MSEs") on their patients with no concern for medical necessity, simply to get Medicare reimbursement. At Mobile Doctors, scheduling managers are responsible for scheduling MSEs, and they do so without consulting the patient's doctor regarding whether an MSE is necessary. A monthly report of patients with billable diagnoses for an MSE is sent to the scheduling manager of each branch, and they are instructed to schedule MSEs for each of the patients.

56.     Relators Lisa Verona and Lisa Higgins attempted to stop this fraudulent process in the Chicago branch roughly one year prior to Higgins' termination in July 2013. When Dike Ajiri learned of their actions, he refused to allow her to continue checking for indications of medical necessity in the patient's chart prior to scheduling the MSE. This interception is no longer being performed, and all patients on the list are again being scheduled for MSEs.

57.     The MSE-related fraud in the Chicago branch is more rampant than in other branches, where Mobile Doctors has at times permitted the physicians to decide for themselves when to perform MSEs. In the Chicago branch, Mobile Doctors employs one physician, Dr. James Miller III, whose exclusive job is to perform mental status exams on patients. Having a policy in which only Dr. Miller performs MSEs benefits Mobile Doctors financially, because Dr. Miller, unlike other physicians, does not refuse medically unnecessary MSEs. Dr. Miller performs all MSE exams according to the schedule he is given, with no consideration of how the patient got on the schedule or indication of medical necessity. He does not review the patient's chart prior to the MSE visit; he does not take the patient's medical chart with him when he performs the MSE exam; and he is not provided with the patient's diagnosis that led to the MSE being scheduled. He performs MSEs on patients who clearly do not medically require such testing, even once performing an MSE on a comatose patient.

17

58.     The patient's regular physician is typically not notified that one of her patients will be visited by Dr. Miller, taking away that physician's ability to cancel the MSE order or even discuss the need for one. Additionally, by not allowing the patient's regular physician to perform the MSE during the patient's medical visit, Mobile Doctors gets to bill for two separate visits: one by the regular physician, and one by Dr. Miller.

59.     Dr. Miller's mental status exam is extremely cursory. The examination that Dr. Miller performs is actually a Folstein mini-mental exam. Medicare prohibits providers from billing a mini-mental exam as a full-blown MSE.

60.     In addition to the scheduling of MSEs for all new patients that have a billable diagnosis, anyone who received an MSE is automatically scheduled for an MSE one year later, without regard to medical necessity.

61.     Ajiri has acknowledged in emails to the relators that the group's MSE practices are not tied to medical necessity. Relators Lisa Verona and Lisa Higgins attempted to stop the fraudulent scheduling of MSEs by asking doctors directly whether they wanted their patients to have MSEs, and only if they said yes would MSEs get scheduled. Ajiri pushed back. In a May 29, 2013, email to Lisa Higgins and Lisa Verona, Ajiri wrote, "No more deciding who gets and who doesn't. No more letting the doctor decide."

**VIII.   Mobility Challenged**

62.     A requirement for Medicare Part B home health services is that the patient be "homebound." The Medicare Act currently defines homebound as where "the individual has a condition, due to an illness or injury, that restricts the ability of the individual to leave his or her home except with the assistance of another individual or the aid of a supportive devise (such as crutches, a cane, a wheelchair or a walker)." Put another way, "condition of the individual

18

should be such that there exists a normal inability to leave home, [and] leaving home requires a considerable and taxing effort by the individual."

63.     A large percentage of Mobile Doctors' patients are not truly homebound, yet Mobile Doctors continues to provide them with medical services that are billed to Medicare Part B, in violation of Medicare regulations.

64.     In addition, when a Mobile Doctors physician conducts a home visit and reaches a medical determination that the patient is not actually mobility challenged in this way, Mobile Doctors schedules a visit with another one of its physicians for a "second opinion," simply to be able to bill one more visit to Medicare.

## IX.     Co-Pays and Deductibles

65.     Mobile Doctors has a standing practice of not collecting co-pays from its patients, in violation of clear Medicare rules. Once or at most twice a year, it will send a cursory letter to patients purporting to seek the co-pays, but in the same breath the company lets patients know that they do not have to actually pay the co-pay.

## X.     Audit

66.     Mobile Doctors has engaged in a deliberate effort to hide its fraud from the government. In 2011, government representatives arrived at multiple Mobile Doctors locations unannounced and held on-the-spot interviews with several employees. Dave Evans told relator Hendricks that Dike Ajiri wanted everyone to know that Medicare is not entitled to know anything and an answer of "I don't know" is acceptable. Evans instructed Ms. Hendricks not to give Medicare any information. Evans specifically mentioned "upcoding" and told her not to offer any information about it. He told her to tell the auditors that she was doing things as required by Medicare and that she does not know of any fraud. Evans told Ms. Hendricks that

everyone who wants to keep their job should make sure they tell Medicare that Mobile Doctors was doing business the right way.

67.      Ms. Hendricks was also advised that the Medicare audit team had provided a list of patient names whose charts that they wanted to see. Ms. Hendricks learned from other employees that those charts were being pulled immediately and "fixed."

## XI.      Multiple Locations

68.      The various frauds described above are occurring to varying degrees at each of the Mobile Doctors' branches. Relator Shapray Hendricks manages the billing department for the entire Mobile Doctors practice and has personal knowledge of the billing practices for each of the company's branches, as well as for In Home Diagnostics. All of the fraudulent billing practices occur, and are the same, at each location. However, because the relators work out of the Chicago office, they have access primarily to Chicago documents.

## False Claims

### Count I – False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)

69.      Relators incorporate each paragraph of this Complaint as if fully set forth herein.

70.      As described above, Defendants Mobile Doctors, In Home Diagnostics, Ajiri, Evans, and Contreras, knowingly presented, or caused to be presented, to an officer or employee of the United States, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

71.      As described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

72.     As a result of these claims, the United States paid Defendants and suffered damages to be determined at trial.

## Count II – False Claims Act, 31 U.S.C. §§ 3729(a)(1)(C)

73.     Relators incorporate each paragraph of this Complaint as if fully set forth herein.

74.     Defendant Mobile Doctors, and its various corporate entities, IHD, and its various corporate entities, along with Ajiri, Evans, and Contreras, conspired to defraud the Government by getting false or fraudulent claims allowed or paid, and/or conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) or (B), in violation of 31 U.S.C. § 3729(a)(1)(C).

75.     As a result of their acts or omissions, Defendants caused the United States to sustain damages in an amount to be determined at trial.

## Count V – False Claims Act, 31 U.S.C. § 3730(h)

76.     Relators incorporate each paragraph of this Complaint as if fully set forth herein.

77.     As described above, because of their lawful acts to prevent Mobile Doctors and the other Defendants from defrauding the government as alleged herein, and in furtherance of an action to stop such violations and under the False Claims Act, Fluor retaliated against each of the relators in the terms and conditions of their employment.

78.     Defendants are liable for statutory penalties, as well as for special damages.


## **Jury Trial Demanded**

The United States of America, on the relation of Caroline Tyers, Lisa Higgins, Shapray Hendricks, and Lisa Verona, hereby demands trial by jury on all issues so triable.

21

WHEREFORE, Relators Caroline Tyers, Lisa Higgins, Shapray Hendricks, and Lisa Verona, respectfully request that the Court enter judgment in their favor and in favor of the United States of America against Defendants, awarding treble damages and penalties for violations of 31 U.S.C. § 3729, and awarding relators Caroline Tyers, Lisa Higgins, Shapray Hendricks, and Lisa Verona, thirty percent of the government's recovery as well as their costs and attorney fees.

Respectfully submitted,

Roshna Bala Keen

Mike Kanovitz
Roshna Bala Keen
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
Phone: (312) 243-5900
Fax:   (312) 243-5902
*Attorneys for Relators*

August 14, 2013